UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------X
EDLEY GAYLE,                                   :        06 Civ. 6956 (PAC) (GWG)

                    Plaintiff,                 :        REPORT AND
                                                        RECOMMENDATION

        -v.-                                   :

NATIONAL RAILROAD PASSENGER CORP.              :
 et al.,
                                               :
                    Defendants.
----------------------------------------------------------------X

This document also applies to:
Adornetti v. National Railroad Passenger Corp., et al., 06 Civ. 6195
Vitale v. National Railroad Passenger Corp., et al., 06 Civ. 6196


**GABRIEL W. GORENSTEIN, UNITED STATES MAGISTRATE JUDGE**

        Defendants STV, Incorporated ("STV"), Hatch Mott MacDonald ("HMM") and a joint

venture between them called "STV/HMM" have moved for summary judgment dismissing the

claims and cross-claims brought against all three parties by plaintiff Edley Gayle and co-

defendants National Railroad Passenger Corporation; Mitchell Equipment Corporation;

Transportation Resources, Inc.; Terex Corporation; Koehring Cranes, Inc.; Terex Cranes, Inc.;

Atlantic Crane Inspection Services; and Crescent Contracting.  These same three defendants

have also moved for summary judgment in cases brought by two other plaintiffs: Joseph

Adornetti (Docket # 06 Civ. 6195) and Girolamo Vitale (Docket # 06 Civ. 6196).

        In each of the three cases, STV and STV/HMM jointly filed a notice of motion and

supporting papers, and HMM separately filed its own notice of motion and supporting papers.

For purposes of simplicity, we consider the arguments of all three movants together and will

sometimes refer to them collectively as STV/HMM.  In addition, while the citations in this

Report and Recommendation refer exclusively to the filings in the <u>Gayle</u> case (Docket # 06 Civ. 6956), the content applies equally to the claims in all three cases inasmuch as the parties' papers in all three cases are substantively the same.

For the reasons stated below, the motions for summary judgment by all three defendants in each of the three cases should be granted.

I.      <u>BACKGROUND</u>

    A.      <u>Facts</u>

Unless otherwise stated, the following facts are not in dispute or are taken in the light most favorable to the parties opposing the motions ("the nonmovants").

        1.      <u>Events of July 10, 2004</u>

This suit arises from a crane accident that occurred on July 10, 2004.  <u>See</u> Amended Civil Action Complaint of Plaintiff Edley Gayle, filed May 10, 2007 (Docket # 39) ("Am. Compl.") ¶ 22; Third Party Defendant Hatch Mott MacDonald's Rule 56.1 Statement of Undisputed Material Facts, filed July 16, 2009 (Docket # 127) ("HMM R. 56.1 Statement") ¶ 1.  At the time of the accident, co-defendant National Railroad Passenger Corporation ("Amtrak") had three separate and unrelated construction projects underway along the Number 1 line of the East River Tunnel running between Manhattan and Queens.  <u>See</u> HMM R. 56.1 Statement ¶ 1; Deposition of Howard Carter, Jr. (annexed as Ex. A to Declaration of Robert Ely in Support of Defendant Hatch Mott MacDonald's Motion for Summary Judgment, filed July 16, 2009 (Docket # 126) ("Ely Decl.")) ("Carter Dep."), at 40-41.  The three projects were, from west to east, (1) the removal and replacement of track ties, (2) the installation of a fire standpipe system (the "Standpipe Project"), and (3) the removal and installation of a breaker (the "Breaker Project").

2

Carter Dep. at 39-42.  The Breaker Project, which did not involve STV/HMM or its personnel, utilized a RT Terex crane owned and operated by Amtrak, and was located approximately 4,062 feet east from the Standpipe Project.  See Carter Dep. at 32, 46-47; National Railroad Passenger Corporation Service Contract (Dec. 11, 2001) (annexed as Ex. C.1 to Declaration of Ronald E. Joseph in Support of Defendant National Railroad Passenger Corp.'s Opposition to Defendant STV Inc.'s, Hatch Mott MacDonald's and STV/HMM's Motions for Summary Judgment, filed Oct. 2, 2009 (Docket # 169) ("Joseph Decl.")) ("STV/HMM Service Contract") ¶¶ 11(b), (f).[1]

Amtrak had contracted with STV/HMM to provide construction management services for the Standpipe Project, which was part of a larger contract under which STV/HMM was providing services for installation of dry fire standpipe systems along the East River Tunnels running from New York Pennsylvania Station to Long Island City.  See Statement of Work for Contracted Construction Management Services for Installation of a Dry Fire Standpipe System in Amtrak s [sic] North River Tunnel and East River Tunnel (Oct. 10, 2001) (annexed as Ex. C.2 to Joseph Decl.) ("Work Statement") ¶ 1.  Crescent Contracting, Inc. ("Crescent") was the general contractor hired to install the standpipe system.  Deposition of Dennis Nazzaro (annexed as Ex. C to Ely Decl.) ("Nazzaro Dep."), at 51; Deposition of Louis Cevasco (annexed as Ex. E to Affidavit in Support, filed July 16, 2009 (Docket ## 123, 124) ("Kalman Decl.")) ("Cevasco Dep."), at 16.  The Standpipe Project's workers consisted of STV/HMM staff, including a safety engineer; construction workers employed by Crescent; and Amtrak employees, including "pilots" and/or "force account" personnel who piloted rail trucks to and from the worksite.  See

_____

[1] The Court has inserted numbers following the exhibit letters where necessary to distinguish among multiple documents submitted as a single exhibit.

3

Cevasco Dep. at 12-13; Deposition of Girolamo Vitale (annexed as Ex. J to Ely Decl.) ("Vitale Dep."), at 37, 52; Declaration of Howard Carter, Jr. (annexed as Ex. B to Joseph Decl.) ("Carter Decl.") ¶ 4.  In July 2004, Gayle was an Amtrak pilot assigned to the Standpipe Project.  See Deposition of Edley Gayle (annexed as Ex. B to Ely Decl.) ("Gayle Dep."), at 40-41.  In addition to Gayle, Amtrak also assigned Amtrak employees Derek Ezekial and Sam Nesmith to the Standpipe Project.  Carter Decl. ¶ 4.  Under the contract, the role of Gayle, Ezekial, and Nesmith, as force account personnel, was to supply "track protection."  See Work Statement ¶ 1.3.1.

Amtrak monitored movement along the railroad line and briefed Amtrak foremen assigned to the various work sites regarding construction and movement at other locations on the track.  See Carter Dep. at 49-52, 67; Gayle Dep. at 59.  Pursuant to rules promulgated by the Northeast Operating Rules Advisory Committee, Amtrak Foreman David Zwolinski had taken the track at the Standpipe Project out of service to permit construction work.  See Carter Dep. at 50, 152-53.  Zwolinski, who oversaw track protection along the full line, was charged with monitoring track movement.  See Carter Dep. at 38-39.  Amtrak Foreman Bobby Avent was responsible for track protection at the Breaker Project, which was located less than a mile from the Standpipe Project.  See id. at 32, 47.  It is unclear whether Ezekiel or Gayle, both Amtrak foremen assigned to the Standpipe Project, was the head track protection officer responsible for that site.  See Gayle Dep. at 157; Carter Dep. at 55, 66.  Nevertheless, both were aware of the Breaker Project.  See Gayle Dep. at 55-59.  Gayle testified that prior to entering the work site, Ezekiel informed him along with other Amtrak pilots, and "contract truck drivers" of the Breaker

Project and that the work crew's equipment included a crane.  <u>See</u> Gayle Dep. at 53-61.[2]  While

Gayle was in one of the Crescent rail trucks, <u>see</u> Gayle Dep. at 75, Ezekiel was stationed above

the East River Tunnel, but had left his post with fellow Amtrak Foreman Nesmith prior to the

accident, <u>see</u> Gayle Dep. at 263-64, Deposition of Derrick Ezekiel (annexed as Ex. X to Joseph

Decl.) ("Ezeliek Dep."), at 43.  At the time of the accident, Ezekiel was in a car returning to the

work site from Pennsylvania Station.  <u>See</u> Ezeliek Dep. at 45-46.  In addition, Louis Cevasco,

STV/HMM's safety engineer assigned to the Standpipe Project, was present at the work site on

July 10, 2004.  <u>See</u> Cevasco Dep. at 12-18, 26.

 At around 3:40 a.m. on July 10, 2004, Amtrak crane operator David Rollins lost control

of the crane at the Breaker Project.  <u>See</u> Deposition of David Rollins (annexed as Ex. D to Ely

Decl.), at 70-71; Carter Dep. at 193-99.  The crane began rolling the approximately 4,062 feet

towards the Standpipe Project.  <u>See</u> Carter Dep. at 32.  At least four or five minutes later, the

crane collided with three trucks at the Standpipe Project injuring several people including Gayle.

<u>See</u> Carter Dep. at 73; Excerpts From Pennsylvania Station Command Control Transcripts

(annexed as Ex. N to Joseph Decl.) ("PSCC Transcripts"), at CVS 001030.[3]  At the time of the

accident, Gayle was the only Amtrak pilot in place at the Standpipe Project work site.  <u>See</u> Gayle

Dep. at 87-88.

---

  [2] It was Amtrak's practice for chief protection officers assigned to contractor work crews to brief contract staff about track conditions prior to the start of work at the site.  <u>See</u> Carter Dep. at 66; Gayle Dep. at 60-61.

  [3] The precise time of the collision is a matter of dispute between the parties.  <u>See</u> Plaintiff Edley Gayle's Response to Defendant Hatch Mott MacDonald's Rule 56.1 Statement of Undisputed Material Facts, filed Sept. 25, 2009 (Docket # 150) ("Gayle 56.1 Response to HMM"), at 4.

Glenn Pedersen, a construction supervisor employed by HMM, testified that between one to three minutes before the crane's collision he heard a beeping sound that indicated movement along the line.  See Deposition of Glenn Pedersen (annexed as Ex. H to Joseph Decl.) ("Pedersen Dep."), at 8-14, 19.  Pedersen, who was sitting in one of the three Crescent rail trucks along side Cevasco, who also heard the alarm, turned to check for movement and eventually saw the crane rolling towards the site seconds before its impact.  See id. at 9-10.  Pedersen testified that it was common to hear the particular sound at issue, and that it was the same sound that was made by trucks at the Standpipe Project site.  Pedersen Dep. at 13.

## 2.      Efforts to Warn the Standpipe Project of the Runaway Crane

Amtrak's investigation showed that, after his crew lost control of the crane at the Breaker Project site, Avent made a distress call on a general radio channel stating "[e]mergency, emergency, emergency.  The crane is rolling away."  Carter Dep. at 80.[4]  Carter, who reviewed tapes of the radio transmissions, testified that Avent's message was very faint.  See Carter Dep. at 80-82.  Gayle testified that he did not hear an emergency message.  See Gayle Dep. at 172.  At 3:43 a.m., Avent also telephoned Pennsylvania Station Command Control ("PSCC") to report that the crane was "rolling towards the tunnel."  See PSCC Transcripts at CVS 001030.  Avent concluded the transmission stating "[l]et me try to get a hold of Gayle or one of those guys."  Id. At 3:45 a.m., Gayle contacted PSCC to report that the crane had collided with the Standpipe work crew and that several people, including himself, were seriously injured.  See id. Ezekiel testified that, while driving back to the work site from Pennsylvania Station, he received a phone

---

[4] The parties dispute whether this evidence constitutes hearsay. Because it is not material to the summary judgment issue, we do not reach the question of its admissibility.

call alerting him of the crane's movement, and he attempted to contact Gayle on his cell phone to warn him, although he did not get through.  See Ezekiel Dep. at 45-47.  Ezekiel could not recall what time he received the phone call or when he attempted to warn Gayle of the crane's movement.  See id. at 46-47.

The Standpipe Project work crew carried communication equipment in the form of cell phones and radios.  See Nazzaro Dep. at 32-33; Gayle Dep. at 91-92.  Indeed, in its contract with Amtrak, there was a provision in which STV/HMM agreed to "equip all field personnel with radio and/or other communications (walkie-talkie, cell phones, pagers, etc.) using a frequency that would be available to selected Project personnel as shown in the Other Direct Costs."  Work Statement ¶ 3.1.6(D).  Dennis Nazzaro, the Assistant Project Manager for the STV/HMM joint venture, testified that he was aware of "dead zones" for communications in the tunnel but did not take any remedial measures.  Nazzaro Dep. at 21, 31.  Likewise, Cevasco acknowledged in his testimony that prior to the accident cell phone and radio services would fail at certain points in the tunnel.  See Cevasco Dep. at 79.  He discussed the issue informally with Amtrak, but did not take any steps to formally address the problem with STV/HMM or Amtrak.  See id. at 80.  There was no testimony from either individual as to the state of communications capabilities on the night of the accident, and Gayle testified that both his cell phone and radio were working properly at that time as he was able to communicate with other locations including the PSCC both prior to and after the collision.  See Gayle Dep. at 92-93, 132-33.

### 3.    Amtrak's Contract with STV/HMM for Construction Management Services

As noted, Amtrak had contracted with STV/HMM to provide construction management services for the Standpipe Project.  The service contract incorporated a separate statement of

work and general provisions for the construction management services.  See STV/HMM Service

Contract ¶ 11.  The contract stated that STV/HMM was obligated to:

A.  Provide oversight of the General Construction Contractor (GC) and other outside support contracts let by Amtrak.  Monitor Amtrak['s] Force Account by field inspection, regularly scheduled progress reviews and by analyzing updates to approved CPM schedules.

B.  Facilitate through an approved QA/QC program that all construction as described in the project plans and specifications is provided by the outside GC and sub-contractors.

C.  Maintain appropriate records detailing all project activities.

D.  Take action to minimize unanticipated construction changes, claims, and budget increases.

E.  Provide procedures to ensure strict compliance by the GC and sub-contractors to all contract terms and conditions.

F.  Perform pre-construction design reviews to identify possible constructibility problems or value engineering savings pending approval by Amtrak.

G.  Review and comment on GC Safety Plan and monitor GC Safety Plan during construction.

H.  Utilize applicable Amtrak standard operating procedures to ensure that the outside GC and sub-contractor(s) perform their work in a manner that will minimize the impact of their work activities on railroad operations and railroad passengers.

I.  Coordinate all track outages for General Contractor, Subcontractors or 3rd Party Contractor (utilities).

Work Statement ¶ 1.2.  The "Amtrak Project Manager" was required to "support [STV/HMM's]

efforts in obtaining track outages, arranging protection and providing security with regard to

passengers only.  [STV/HMM] shall provide security for the Project Management operations in

accordance with its Contract General Provisions."  Id. ¶ 2.8.

8

STV/HMM was "responsible for providing all technical field support personnel, including project managers, schedulers, resident engineers, field inspectors and safety engineer [sic], for the purpose of managing, monitoring, and inspecting the work of the [general contractor] and all subcontractors, Amtrak force account and utility companies."  Id. ¶ 2.5.1. The contract states that STV/HMM would:

> (i) monitor the work of Amtrak[']s force account; (ii) provide assistance in planning, budget analysis and job control; (iii) provide technical assistance if required; and (iv) coordinate force account work with work to be scheduled or having been performed by others, and integrate all construction operations into a Master Construction Schedule.

Id. ¶ 1.3.1.  "[F]orce account" personnel included Amtrak pilots assigned to the Standpipe Project.  See Carter Decl. ¶ 4.  An "Amtrak Project Manger" was to be "responsible for providing project management guidance to address matters pertaining to," among other issues, "Amtrak Force Account monitoring/interface and site specific work plans."  Work Statement ¶ 2.8.

STV/HMM's safety engineers were required to have at least seven years of experience in safety and heavy construction projects as well as familiarity with "Amtrak, LIRR, [and] OSHA safety regulations."  Id. ¶ 2.6.2(E).  STV/HMM agreed to designate a safety officer "to ensure that all construction work is being performed in accordance with standard industry practices and with state and federal laws regulating job site safety."  Id. ¶ 3.2.11.  If the safety officer observed "[q]uestionable work practices," he was directed to notify STV/HMM and Amtrak "verbally and in writing prior to" the start of "work in the field."  Id.  Separately, STV/HMM agreed to develop procedures to inform Amtrak of "developing issues, concerns and specific problems associated with the Project."  Id. ¶ 3.1.5.

The contract states that "responsibilities identified" therein "are not intended to portray the complete extent of the services required[]" of STV/HMM.  Work Statement ¶ 2.5.5.  "Rather, such responsibilities are intended to highlight areas of particular concern to Amtrak. [STV/HMM] shall provide whatever other services as may be necessary and/or required to properly manage the project."  Id.

A.    Procedural History

In 2006, Gayle initiated a personal injury suit against defendants STV/HMM and Amtrak, as well as against Terex Corporation; Koehring Cranes Inc.; Terex Cranes; Mitchell Equipment; T.C. Johnson Company; Transportation Resources, Inc.; Crescent; and Atlantic Crane Inspection Services.  See Plaintiff's Civil Action Complaint, filed Sept. 11, 2006 (Docket # 1); Am. Compl.  The defendants filed answers, many with cross-claims against each other.[5]

---

[5] See Answer to Amended Civil Action Complaint of Plaintiff, filed May 24, 2007 (Docket # 40); Answer to Amended Complaint, filed May 24, 2007 (Docket # 41); Transportation Resources Inc.'s Answer to Amended Complaint of Plaintiff Edley Gayle, filed June 5, 2007 (Docket # 44); Defendant Atlantic Crane Inspection Services, Inc.'s Answer to Plaintiff's First Amended Complaint, Cross-Claims and Jury Demand, filed June 19, 2007 (Docket # 51); Verified Answer to Plaintiff Gayle's Amended Complaint with Jury Demand, filed June 23, 2007 (Docket # 53); Answer to Amended Complaint with Cross-Claims, filed Feb. 4, 2008 (Docket # 72); Answer to Plaintiff's Complaint, filed Mar. 13, 2008 (Docket # 85).

In July 2009, HMM, STV, and STV/HMM filed motions for summary judgment.[6]

Gayle,[7] along with co-defendants and cross-claimants Amtrak[8] and Crescent[9] filed opposition

papers.  HMM and STV/HMM replied.[10]

---

[6] <u>See</u> Notice of Motion for Summary Judgment, filed July 16, 2009 (Docket # 120); Rule 56.1 Statement, filed July 16, 2009 (Docket # 121) ("STV/HMM R. 56.1 Statement"); Kalman Decl.; Memorandum of Law in Support of Defendant STV, Inc. and STV/HMM's Motion for Summary Judgment, filed July 16, 2009 (Docket # 122) ("STV Br."); Notice of Motion for Summary Judgment, filed July 16, 2009 (Docket # 125); Ely Decl.; HMM R. 56.1 Statement; Memorandum of Law, filed July 16, 2009 (Docket # 128) ("HMM Br.").

[7] <u>See</u> Plaintiff Edley Gayle's Brief in Response to Hatch Mott MacDonald's Motion for Summary Judgment, filed Sept. 25, 2009 (Docket # 149) ("Gayle Br. HMM"); Gayle 56.1 Response to HMM; Plaintiff Edley Gayle's Brief in Response to Defendants STV, Incorporated and STV/HMM, a Joint Venture's ("STV and STV/HMM") Motion for Summary Judgment, filed Sept. 28, 2009 (Docket # 151) ("Gayle Br. STV/HMM"); Plaintiff Edley Gayle's Response to Defendant's STV, Incorporated and STV/HMM, a Joint Venture's Rule 56.1 Statement of Undisputed Material Facts, filed Sept. 28, 2009 (Docket #152).

[8] <u>See</u> Joseph Decl.; Defendant National Railroad Passenger Corp's Memorandum of Law in Opposition to Defendants STV Inc., Hatch Mott MacDonald Inc., and STV/HMM, a Joint Venture's Motions for Summary Judgment, filed Oct. 2, 2009 (Docket # 170) ("Amtrak Br."); Defendant National Railroad Passenger Corp.'s Rule 56.1(b) Statement in Response to Defendant STV Inc. and STV/HMM's Rule 56.1(a) Statement, filed Oct. 3, 2009 (Docket # 171); Defendant National Railroad Passenger Corp.'s Rule 56.1(b) Statement in Response to Defendant HMM's Rule 56.1(a) Statement, filed Oct. 3, 2009 (Docket # 172) ("Amtrak 56.1 Response to HMM").

[9] <u>See</u> Defendant Crescent Contracting, Inc.'s Memorandum of Law in Opposition to Motion for Summary Judgment of Defendants STV, Inc., and STV/HMM a Joint Venture of STV Incorporate and Hatch Mott MacDonald, filed Oct. 2, 2009 (Docket # 159) ("Crescent Br."); Affirmation in Opposition, filed Oct. 2, 2009 (Docket # 164), Affirmation in Opposition, filed Oct. 2, 2009 (Docket # 165).

[10] <u>See</u> Reply Memorandum of Support, filed Oct. 22, 2009 (Docket # 173); Reply Affirmation in Further Support, filed Oct. 22, 2009 (Docket # 174); Response to the Additional Facts Section of Crescent Contracting, Inc.'s Response to STV, Inc's and STV/HMM's Rule 56.1 Statement, filed Oct. 22, 2009 (Docket # 175); Response to the Additional Facts Section of Edley Gayle's Response to STV, Inc's and STV/HMM's Rule 56.1 Statement, filed Oct. 22, 2009 (Docket # 176);  Response to the Additional Facts Section of National Railroad Passenger Corp.'s Response to STV, Inc's and STV/HMM's Rule 56.1 Statement, filed Oct. 22, 2009 (Docket # 177); Reply Memorandum of Law in Support of Defendants STV, Inc. and

II.     APPLICABLE LAW

      A.      Standard of Review

    Rule 56(c) of the Federal Rules of Civil Procedure states that summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c)(2).  A genuine issue of material fact "may reasonably be resolved in favor of either party" and thus should be left to the finder of fact.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986).

    When determining whether a genuine issue of material fact exists, courts must resolve all ambiguities and draw all factual inferences in favor of the non-moving party.  Id. at 255 (citing Adickes v. S.H. Kress & Co., 398 U.S. 144, 158-59 (1970)).  Nevertheless, once the moving party has shown that there is no genuine issue as to any material fact and that it is entitled to a judgment as a matter of law, the non-moving party "must come forward with 'specific facts showing that there is a genuine issue for trial,'" Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)) (emphasis in original), and "may not rely on conclusory allegations or unsubstantiated speculation," Jeffreys v. City of N.Y., 426 F.3d 549, 554 (2d Cir. 2005) (citation omitted).  In other words, the non-movant must offer "concrete evidence from which a reasonable juror could return a verdict in his favor . . . ."

_____

STV/HMM's Motion for Summary Judgment, filed Oct. 22, 2009 (Docket # 178); Response to the Additional Facts Section of Crescent Contracting, Inc.'s Response to Hatch Mott MacDonald's Rule 56.1 Statement, filed Oct. 23, 2009 (Docket # 183); Response to the Additional Facts Section of Plaintiff Edley Gayle's Response to Hatch Mott MacDonald's Rule 56.1 Statement, filed Oct. 23, 2009 (Docket # 184); Response to the Additional Facts Section of National Railroad Passenger Corps's Response to Hatch Mott MacDonald's Rule 56.1 Statement, filed Oct. 23, 2009 (Docket # 185).

Anderson, 477 U.S. at 256.  Where "the nonmoving party bears the burden of proof at trial, summary judgment is warranted if the nonmovant fails to make a showing sufficient to establish the existence of an element essential to its case."  Nebraska v. Wyoming, 507 U.S. 584, 590 (1993) (internal citation, quotation marks, and brackets omitted).  Thus, "[a] defendant moving for summary judgment must prevail if the plaintiff fails to come forward with enough evidence to create a genuine factual issue to be tried with respect to an element essential to its case." Allen v. Cuomo, 100 F.3d 253, 258 (2d Cir. 1996); accord Parker v. Sony Pictures Entm't, Inc., 260 F.3d 100, 111 (2d Cir. 2001) ("A defendant need not prove a negative when it moves for summary judgment on an issue that the plaintiff must prove at trial.  It need only point to an absence of proof on plaintiff's part, and, at that point, plaintiff must 'designate specific facts showing that there is a genuine issue for trial.'") (citation omitted); Feurtado v. City of N.Y., 337 F. Supp. 2d 593, 599-600 (S.D.N.Y. 2004).

B.    Negligence

"To establish a defendant's negligence, a plaintiff must show the existence of a duty, a breach of that duty, and that the breach was a proximate cause of the plaintiff's injury."  Solan v. Great Neck Union Free Sch. Dist., 43 A.D.3d 1035, 1036 (2d Dep't 2007) (citation omitted).

"Because a finding of negligence must be based on the breach of a duty, a threshold question in tort cases is whether the alleged tortfeasor owed a duty of care to the injured party." Espinal v. Melville Snow Contractors, Inc., 98 N.Y.2d 136, 138 (2002) (citations omitted); accord Chahales v. Westchester Joint Water Works, 47 A.D.3d 610, 610 (2d Dep't 2008) ("It is axiomatic that before a defendant may be held liable for negligence it must be shown that the defendant owes a duty to the plaintiff.  In the absence of duty, there is no breach and without a

13

breach there is no liability." (internal citation, quotation, and punctuation omitted)).  "It is initially for the court to determine whether a duty exists."  <u>Solan</u>, 43 A.D.3d at 1036 (citation omitted).[11]  "In the absence of duty, there is no breach and without a breach there is no liability." <u>Moore v. J.A. Bradley & Sons, Inc.</u>, 68 A.D.3d 1419, 1421 (3d Dep't 2009) (internal citation and quotation marks omitted).

While "[n]ormally, in New York, breach is determined by the jury," a jury will decide the question "only in those cases where there arises a real question as to a defendant's negligence . . . ." <u>Di Benedetto v. Pan Am World Serv., Inc.</u>, 359 F.3d 627, 630 (2d Cir. 2004) (internal citations, brackets, and punctuation omitted).  Thus, the Second Circuit has upheld summary judgment in a negligence action where plaintiff "presented no facts on summary judgment as to an alleged breach" of the defendant's duty of care.  <u>King v. Crossland Sav. Bank</u>, 111 F.3d 251, 259, 260 (2d Cir. 1997); <u>see also</u> <u>Cameron v. Cmty. Aid For Retarded Children, Inc.</u>, 335 F.3d 60, 63 (2d Cir. 2003) ("Summary judgment is appropriate where the nonmoving party has failed to establish the existence of a genuine dispute of fact as to an essential element of the claim.").

Under New York law, "[a] breach is the proximate cause of an injury if the breach was a substantial factor in causing the injury."  <u>Sawyer v. Wight</u>, 196 F. Supp. 2d 220, 227 (E.D.N.Y. 2002) (citation omitted); <u>see also</u> <u>Maheshwari v. City of N.Y.</u>, 2 N.Y.3d 288, 295 (2004) ("To

---

[11] Thus Gayle's assertion that "[a] jury should . . . evaluate [STV/HMM's] actions here to determine whether [it] had a duty to ensure that safe and reliable communications equipment was available to the Standpipe Project personnel," Gayle Br. STV/HMM at 13, is incorrect.  The existence and scope of a duty of care is a legal determination and not a question of fact.  <u>See, e.g.</u>, <u>Darby v. Compagnie Nat'l Air France</u>, 96 N.Y.2d 343, 347 (2001) ("it is for the courts first to determine whether any duty exists"); <u>Gadani v. Dormitory Auth. of State of N.Y.</u>, 64 A.D.3d 1098, 1102 (3d Dep't 2009) ("the existence of a duty is a question of law to be determined by the courts").

establish a prima facie case of proximate cause, a plaintiff must show 'that the defendant's negligence was a substantial cause of the events which produced the injury[.]'" (quoting Derdiarian v. Felix Contr. Corp., 51 N.Y.2d 308, 315 (1980))).  It is possible for there to be "more than one proximate cause of an accident."  Scala v. Scala, 31 A.D.3d 423, 424-25 (2d Dep't 2006) (citing Forte v. City of Albany, 279 N.Y. 416, 422 (1939); Hyde v. Long Is. R.R. Co., 277 A.D.2d 425, 426 (2d Dep't 2000)).

III.    DISCUSSION

    A.    STV/HMM Responsibility for Worksite and Track Safety

    Amtrak is the only party to cite any legal authority on the question of STV/HMM's duty of care.  The standard put forth by Amtrak – one that is apparently uncontested by STV/HMM – is that STV/HMM may be liable for negligence to the extent it had "authority to supervise or control the performance of the work." Amtrak Br. at 11 (quoting Domino v. Prof'l Consulting, Inc., 57 A.D.3d 713, 713 (2d Dep't 2008)).  Indeed, case law reflects that a contractor is liable in negligence for injuries to its workers unless it can "establish that it lacked the authority to control or supervise the activity which is alleged to have been a cause of the injury . . . ." Weitz v. Anzek Const. Corp., 65 A.D.3d 678, 681 (2d Dep't 2009).  No party argues that, absent an enforceable contractual agreement, STV/HMM could be found vicariously liable for negligence that it did not itself commit, but was instead committed by another party, such as Amtrak.[12]

---

    [12] While no one has argued that New York Labor Law § 241(6) applies here, under that statute a contractor can be held vicariously liable for failing to provide a safe workplace only if there was "a violation of a concrete regulation of the Industrial Code requiring a specific standard."  England v. Vacri Const. Corp., 24 A.D.3d 1122, 1123 (3d Dep't 2005).  No such violation has been alleged here.

In addition, Amtrak argues that contractual obligations can impose a legal duty on contractors where they assume "certain safety responsibilities under the relevant contract to a 'known and identifiable group.'" Amtrak Br. at 11 (quoting Palka v. Servicemaster Mgmt. Serv. Corp., 83 N.Y.2d 579 (1994)). STV/HMM does not contest that it may be held liable in negligence for violation of any safety obligations in the contract.

Accordingly, we examine whether STV/HMM "supervised or controlled" the performance of the work that is alleged to have been a cause of the injury and whether it breached its contractual obligations with respect to project safety.

The moving brief of STV (along with STV/HMM) focuses almost exclusively on a question that is ultimately not disputed in this case: whether STV/HMM "owed plaintiffs a duty with respect to Amtrak losing control of its crane . . . ." STV Br. at 15. To support its argument that it cannot be responsible for any injuries to the plaintiffs, STV marshals the copious undisputed evidence that the Breaker Project was completely separate from the Standpipe Project, that the Breaker Project was not overseen by STV/HMM, and that STV/HMM had no control over the Breaker Project's crane. Id. at 3-14. Certainly, this evidence is sufficient to show that STV/HMM did not "supervise or control" the Breaker project. But these arguments do not dispose of this case because the question remains whether STV/HMM breached a duty to provide a safe working environment for the workers at the Standpipe site.

To support their argument that STV/HMM breached its duty to the workers, the nonmovants point to a number of provisions in Amtrak's contract with STV/HMM that they believe STV/HMM violated. All of these relate to STV/HMM's obligation to manage the Standpipe Project and to provide its workers with a safe environment in which to work. See,

e.g., Crescent Br. at 8 (citing Work Statement ¶ 3.2.11) (requiring that STV/HMM "designate a Safety Officer . . . to ensure that all construction work is being performed in accordance with standard industry practices and with state and federal laws regulating job site safety"); Amtrak Br. at 4 (same); Gayle Br. STV/HMM at 5-6 (citing in addition Work Statement ¶¶ 2.6.2(E), 3.2.2(F)) (requiring STV/HMM to designate a Safety Engineer with seven "years of experience . . . [and] familiar with all required Amtrak, LIRR, OSHA safety regulations" and that STV/HMM "monitor the construction contractor to ensure all work is performed in compliance with Amtrak/LIRR, OSHA, city, state, safety, and federal environmental regulations.").  Indeed, as already described, there is no question that the contract made STV/HMM responsible for the work at the Standpipe Project site and ensuring the safety of the workers there.

At the same time, there is overwhelming and uncontradicted evidence that Amtrak had exclusive control over one aspect of safety that could impact the Standpipe Project: that is, track safety.  To provide context for the claims against STV/HMM, this was not a situation where a contractor was conducting work at, for example, a self-contained location where it could be expected to take full responsibility for protecting its workers from hazards, including hazards that might originate from outside the worksite.  Rather, the work location here was a railroad track, and Amtrak, the party that arranged the contract, had exclusive control over movement over that track.  To ensure worker safety, Amtrak subscribed to elaborate procedures to ensure that no unauthorized rail traffic occurred on that track during work by an outside contractor.

Amtrak was governed by the "Northeast Rules Operating Committee" ("NORAC") rules, see Carter Dep. at 142-55, which are a set of rules governing railroad operations that are subscribed to by a number of railroads including Amtrak, see NORAC Operating Rules (Jan. 1,

2003) (annexed as Ex. E to Ely Decl.) ("NORAC").  These rules require that qualified employees of Amtrak – not any other party – be "assigned to protect work locations of railroad construction or private contractors whose operations may affect the safe movement of trains . . . ."  NORAC Rule 131.  The NORAC rules provide specific actions that these Amtrak workers must undertake to ensure track safety, including getting permission to "foul" the track, <u>see</u> NORAC Rule 131(2) – an event that would by definition include the placement of workers or work equipment from STV/HMM on or near the track.[13]  Thus, when a contractor needs to do work on the track, "the employee assigned to protect the work location must communicate with the employee in charge of the track to secure necessary permission."  NORAC Rule 131(3).[14]

The NORAC rules further set forth procedures for removing a track from service, which was necessary to allow the Standpipe Project to proceed.  The Rules state that a "Dispatcher" will issue a document referred to as "Form D" to the Amtrak employee who requests that the track be taken out of service.  NORAC Rule 133.  The unrefuted testimony was that Amtrak employees used this procedure with respect to the Standpipe Project.  Carter Dep. at 60.

---

[13] "Fouling a track" is defined by federal regulation as "the placement of an individual or an item of equipment in such proximity to a track that the individual or equipment could be struck by a moving train or on-track equipment, or in any case is within four feet of the field side of the near running rail."  49 C.F.R. § 214.7.

[14] In their Rule 56.1 Statements, Gayle and Amtrak dispute that NORAC Rule 131 governed the particular procedures at the Standpipe Project site inasmuch as the track had been taken out of service entirely due to the other projects.  Gayle 56.1 Response to HMM at 3-4; Amtrak 56.1 Response to HMM, at 9-10.  It is not necessary to resolve this issue, however, because the parties do not dispute that, under the NORAC rules, Amtrak (not STV/HMM) was responsible for preventing any movement on the tracks in or near the STV/HMM construction area.

Consistent with this obligation, the contract obligated STV/HMM to include as part of its work crew, "force account personnel" from Amtrak whom the contract deemed responsible for providing "protection," see Work Statement ¶ 1.3.1 – a term that no party disputes referred to track protection.  The Amtrak personnel providing the track protection function were referred to as "foreman" or "pilots."  See Carter Decl. ¶ 4; Carter Dep. at 56-57.  Thus, it was these personnel who arranged for STV/HMM to gain entry to the track to perform the Standpipe Project and who remained at the Standpipe Project worksite to control movement on the track.

The record contains descriptions of the efforts that Amtrak personnel made to inform supervisory Amtrak personnel of the various worksites and to ensure that there would be no trains running on the tracks while the STV/HMM workers were on site.  See, e.g., Carter Dep. at 56-58.  No work could be undertaken, in fact, without the "Form D" supplied by Zwolinski and obtained by the Amtrak track safety personnel.  See id. 151-54.

Against this overwhelming evidence that Amtrak supervised and controlled track safety at the Standpipe Project, there is no countervailing evidence that STV/HMM had such supervision and control.  Workers needed Amtrak's permission to enter the Standpipe Project work site after Amtrak designated the track out of service.  See id. at 151-54.  If an employee of a contractor dropped a tool onto the tracks, the employee needed to receive permission from Amtrak personnel to retrieve the tool.  Cevasco Dep. at 33-36.  Moreover, Amtrak foremen were "in charge of . . . outside contractors" and Amtrak would brief its own foremen at the start of work shifts on activity along the track.  Carter Dep. at 66; see also Gayle Dep. at 55-61.  Gayle himself testified that he reported to an Amtrak supervisor when assigned to the Standpipe Project, not STV/HMM.  See Gayle Dep. at 46-48.  There is simply no testimony or other

admissible evidence from the nonmovants that contradicts these descriptions of the relationship between Amtrak and STV/HMM on the role of Amtrak in track safety.

It is true that the STV/HMM contract required that STV/HMM, with "assistance" from Amtrak, "monitor" the work of the Amtrak force account personnel.  Work Statement ¶ 1.3.1. The term "monitor," however, does not suggest that STV/HMM was responsible for supervising and controlling the performance of track safety function.  Another provision refers generally to the obligation of STV/HMM to "manag[e], monitor[], and inspect[] the work of" a wide range of personnel, including utility companies, subcontractors, and force account personnel.  Id. ¶ 2.5.1. But this generic provision cannot trump the more specific requirements of the NORAC rules, the other terms of the contract, and the actual actions of the participants – all of which reflected that STV/HMM did not and could not supervise and control the work of any force account personnel with respect to track safety or protection.  Indeed, no evidence has been offered by the nonmovants that such supervision and control occurred on this project or on any other project, or that any person viewed the contract as requiring or even permitting STV/HMM to supervise and control the track safety function.  Indeed, the uncontroverted evidence is that in their efforts regarding track protection, these workers answered only to Amtrak personnel.  See Nazzaro Dep. at 25-27 (Amtrak force account workers were responsible for track safety and there was a supervisor on each shift who was responsible for all force account personnel).

In sum, to the extent that the nonmovants argue that STV/HMM had a duty under the contract with Amtrak to provide track safety at the Standpipe Project site, or that STV/HMM "supervised and controlled" track safety at that site, any such argument is rejected.

While this conclusion largely disposes of the arguments made by the nonmovants, we examine the particular failings by STV/HMM that they have alleged to determine whether any of them were in fact within STV/HMM's scope of duty, and if so, whether any alleged breach of that duty was a proximate cause of the injuries to the workers.

B. <u>Specific Arguments by Nonmovants as to STV/HMM's Failings</u>

The nonmovants make essentially three separate claims of alleged negligence by STV/HMM involving (1) the supervision of the pilots at the standpipe site; (2) the existence of communications problems; and (3) the actions of a particular HMM engineer who heard the crane's alarm prior to impact.  Crescent Br. at 7-9; Amtrak Br. at 14-17; Gayle Br. HMM at 10-15.

One of the pilots at the standpipe site, Ezekiel, was stationed at a post above the East River Tunnel, but had left his post with fellow Amtrak foreman Nesmith prior to the accident. <u>See</u> Gayle Dep. at 263, Ezekiel Dep. at 43.  The nonmovants argue that had he remained above the tunnel he "would have been in a position to warn of any emergency."  Amtrak Br. at 15. While Ezekiel was an Amtrak employee  – not an STV/HMM employee – the nonmovants argue that STV/HMM was negligent by not "assur[ing] that he remained at the worksite and in a position to warn of any potential emergencies," <u>id.</u> at 16, and that STV/HMM was negligent in not halting construction work when Ezekiel left, <u>see</u> Crescent Br. at 8, 11.

This argument goes to the scope of STV/HMM's duty to monitor the activities of the Amtrak force account personnel.  As already noted, the force account personnel did not report to STV/HMM on track safety matters and took direction as to the track safety function only from Amtrak personnel.  The parties have not pointed to any evidence suggesting that Amtrak had

alerted STV/HMM as to particular locations within or near the standpipe worksite where Amtrak pilots should be stationed and whether it was necessary for all force account personnel to be present at the site at all times.  Thus, there is no evidence that any of these were matters within STV/HMM's area of control.  Because Amtrak took responsibility for track safety at the worksite, there is nothing to suggest that STV/HMM had a duty to shut down the worksite if one of the multiple Amtrak personnel assigned to the worksite was absent.[15]

In any event, the nonmovants have failed to meet their burden of showing that any failure of STV/HMM to ensure that there was a second Amtrak pilot located at a position above the tunnel was a proximate cause of the workers' injuries.  There is no evidence that a worker in that position could have both seen the oncoming crane and would have been in a position to take any

---

[15] In his deposition, Nazzaro agreed with a question that asked whether having only one Amtrak pilot "affect[ed] safety," and that where safety was affected, STV had the obligation to stop work on the project.  See Nazzaro Dep. at 124.  When pressed, however, he refused to agree that there was an obligation to shut down the project, stating only that STV should have had a "concern" about it.  Id. at 125.  In any event, Nazzaro's testimony did not purport to contradict the fact that Amtrak supervised the Amtrak personnel.  Nor did he testify that STV had any information regarding what number of pilots was required to be present for the safety function to be materially affected.  Thus, while STV/HMM had the authority to halt construction at the Standpipe Project site when there were unsafe working conditions, see id. at 126-27, no party suggests that the STV had a duty to do so merely based on a "concern" – that is, if there was no unsafe work condition.

Although the nonmovants do not appear to make this argument, to the extent it were to be argued that STV's mere authority to stop work demonstrates that STV had "supervision and control" over the worksite such that it is liable in negligence as an owner or contractor, that argument was squarely rejected in Singh v. Black Diamond LLC, 24 A.D.3d 138, 140 (1st Dep't 2005) ("project superintendent . . . had the authority to . . . stop work . . . simply indicates . . . general supervision . . . insufficient to trigger liability"); accord O'Sullivan v. IDI Const. Co., 28 A.D. 3d 225, 227 (1st Dep't 2006) (no liability for defendant responsible merely for "directing the correction of an unsafe condition"); Peay v. N.Y. City Sch. Const. Auth., 35 A.D.3d 566, 567 (2d Dep't 2006) ("Contrary to the plaintiff's contention, the construction manager's authority to stop the contractor's work, if the manager notices a safety violation, does not give the manager a duty to protect the contractor's employees.") (internal citations and brackets omitted).

action to clear the tracks in time to avert any injuries.  "A prima facie case of negligence must be based on something more than conjecture; mere speculation regarding causation is inadequate to sustain the cause of action."  Mandel v. 370 Lexington Ave., LLC, 32 A.D.3d 302, 303 (1st Dep't 2006) (citation and internal quotation marks omitted).  In the absence of any admissible evidence that the placement of a pilot in the location above the tunnel could have had any effect on averting the subsequent accident, the nonmovants have not met their burden of showing proximate cause.

The second alleged failure – that there was a communications "dead zone" at the Standpipe Project in that radio and other electronic communications could not be received – suffers from the same infirmity.  The nonmovants argue that STV/HMM was negligent by "failing to assure that the workers were equipped with devices" that could make and receive communications.  Amtrak Br. at 16; see also Crescent Br. at 11.  They also argue that STV/HMM should have made sure that Gayle had established communication with the PSCC; and that if he could not do so, STV/HMM should have stopped the project.  Amtrak Br. at 21, see also Gayle Br. STV/HMM at 9 (STV/HMM failed to "ensure that personnel at the Standpipe Project had functional and reliable communications equipment").  But there is no evidence that Amtrak gave STV/HMM any specific direction about the monitoring of its track safety workers – let alone direction regarding what STV/HMM should do to ensure specific communication capabilities among Amtrak personnel responsible for track safety.  As previously discussed, Amtrak had reserved to itself the track safety function, and never transferred that function to STV/HMM.

Finally, Amtrak notes that Glenn Pedersen, an HMM engineer, failed to take any steps to alert the workers when he heard the crane's backup alarm.  Amtrak Br. at 17.  Pedersen's testimony, however, was that the beeping sound he heard was the same sound that the Standpipe trucks made, Pedersen Dep. at 13; that he therefore heard it "often," id. at 8; and that it aroused his curiosity only because it continued, id. at 13-14.  By the time he actually observed the crane, it was only "half a second" before the collision occurred.  Id. at 65.  In light of the fact that the beeping sound was common, and in light of Amtrak's control over track safety, Pedersen cannot be chargeable with the duty to have identified this sound under these circumstances as indicating a dangerous instrumentality.

C.      STV/HMM's Indemnification of Amtrak

In its contract, STV/HMM agreed to indemnify Amtrak for any claims arising from "the negligent acts, negligent omissions, or willful misconduct in the Services performed by" STV/HMM.  National Railroad Passenger Corporation General Provisions for Construction Management Services Contract (annexed as Ex. C.3 to Joseph Decl.) ("Gen. Prov.") ¶ 35(A). STV/HMM and Amtrak both agree that STV/HMM's obligation to indemnify Amtrak in this case arises only if STV/HMM were found to be negligent.  See Amtrak Br. at 22; HMM Br. at 2. Because there is no evidence of negligence by STV/HMM, Amtrak's cross-claims for indemnification and breach of contract should be dismissed.  See, e.g., Colyer v. K Mart Corp., 273 A.D.2d 809, 809-10 (4th Dep't 2000) (dismissing indemnification claim where the indemnification obligation was "triggered only in the event of a finding of negligence" and there was "no basis in the record to find such negligence as a matter of law.").

IV.     Conclusion

For the foregoing reasons, STV, STV/HMM and HMM's motions for summary judgment (Docket ## 120 and 125 in 06 Civ. 6956; Docket ## 135 and 141 in 06 Civ. 6195; and Docket ## 138 and 143 in 06 Civ. 6196) should be granted.

**PROCEDURE FOR FILING OBJECTIONS TO THIS
REPORT AND RECOMMENDATION**

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties have fourteen (14) days including weekends and holidays from service of this Report and Recommendation to serve and file any objections.  See also Fed. R. Civ. P. 6(a), (b), (d).  Such objections (and any responses to objections) shall be filed with the Clerk of the Court, with copies sent to the Hon. Paul A. Crotty, and to the undersigned, at 500 Pearl Street, New York, New York 10007.  Any request for an extension of time to file objections must be directed to Judge Crotty.  If a party fails to file timely objections, that party will not be permitted to raise any objections to this Report and Recommendation on appeal.  See Thomas v. Arn, 474 U.S. 140 (1985).

Dated:  March 8 2010
        New York, New York

_____
GABRIEL W. GORENSTEIN
United States Magistrate Judge

## IV.   Conclusion

For the foregoing reasons, STV, STV/HMM and HMM's motions for summary judgment (Docket ## 120 and 125 in 06 Civ. 6956; Docket ## 135 and 141 in 06 Civ. 6195; and Docket ## 138 and 143 in 06 Civ. 6196) should be granted.

**PROCEDURE FOR FILING OBJECTIONS TO THIS
REPORT AND RECOMMENDATION**

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties have fourteen (14) days including weekends and holidays from service of this Report and Recommendation to serve and file any objections.  See also Fed. R. Civ. P. 6(a), (b), (d).  Such objections (and any responses to objections) shall be filed with the Clerk of the Court, with copies sent to the Hon. Paul A. Crotty, and to the undersigned, at 500 Pearl Street, New York, New York 10007.  Any request for an extension of time to file objections must be directed to Judge Crotty.  If a party fails to file timely objections, that party will not be permitted to raise any objections to this Report and Recommendation on appeal.  See Thomas v. Arn, 474 U.S. 140 (1985).

Dated: March 8, 2010
     New York, New York

 

GABRIEL W. GORENSTEIN
United States Magistrate Judge