USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: March 29, 2010

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
EDLEY GAYLE,                                     :
                                                 :
        Plaintiffs,                       :   06 Civ. 6956 (PAC) (GWG)
                                                 :
        - against -                       :   MEMORANDUM
                                                 :   OPINION & ORDER
NATIONAL RAILROAD PASSENGER CORP.,               :
et al.,                                          :
                                                 :
        Defendants,                       :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
JOSEPH ADORNETTI,                                :
                                                 :
        Plaintiffs,                       :   06 Civ. 6195 (PAC) (GWG)
                                                 :
        - against -                       :
                                                 :
NATIONAL RAILROAD PASSENGER CORP.,               :
et al.,                                          :
                                                 :
        Defendants,                       :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
GIROLAMO VITALE,                                 :
                                                 :
        Plaintiffs,                       :   06 Civ. 6196 (PAC) (GWG)
                                                 :
        - against -                       :
                                                 :
NATIONAL RAILROAD PASSENGER CORP.,               :
et al.,                                          :
                                                 :
        Defendants,                       :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

HONORABLE PAUL A. CROTTY, United States District Judge:

      On July 10, 2004, the National Railroad Passenger Corporation ("Amtrak") had three separate and unrelated construction projects in progress along the Number 1 Line of the East River Tunnel in New York City. An Amtrak worker lost control of the crane he

1

was operating at the easternmost project site. The crane rolled west, careening into the neighboring site. The three consolidated actions in this matter involve claims for personal injuries suffered as a result of the out-of-control crane. The three actions are: <u>Gayle v. National Railroad Passenger Corp., et al.</u>, 06 Civ. 6956 (the "<u>Gayle</u> Action"); <u>Adornetti v. National Railroad Passenger Corp., et al.</u>, 06 Civ. 6195 (the "<u>Adornetti</u> Action"); and <u>Vitale v. National Railroad Passenger Corp., et al.</u>, 06 Civ. 6196 (the "<u>Vitale</u> Action"). The issue before the court is whether Defendants STV, Inc. ("STV"), Hatch Mott MacDonald ("HMM"), and a joint venture between them called "STV/HMM," can be held liable for negligence.[1]

The Court referred the general pretrial matters in the three cases to Magistrate Judge Gabriel Gorenstein in August and October, 2006. On July 16, 2009, STV, HMM and STV/HMM moved for summary judgment dismissing the claims and crossclaims asserted against them in all three actions.[2] Opposition papers were filed by the plaintiff in the <u>Gayle</u> Action, Edley Gayle ("Gayle"), and co-defendants and crossclaimants Amtrak and Crescent Contracting, Inc. ("Crescent") (collectively, the "nonmovants"). STV, HMM and STV/HMM replied. On March 8, 2010, Magistrate Judge Gorenstein issued a Report and Recommendation ("R&R") recommending that the Court grant the motions for summary judgment. The Court has reviewed the R&R and the timely objections filed by Gayle ("Gayle Objections") and Amtrak ("Amtrak Objections"). For the reasons that follow, the Court adopts Magistrate Judge Gorenstein's findings and recommendations. The motions for summary judgment are granted.

---

[1] Unless there is a relevant distinction to be made between STV, HMM and STV/HMM, they will be referred to collectively as "STV/HMM."

[2] In each case, STV and STV/HMM filed a joint motion for summary judgment and HMM filed a separate motion.

2

**BACKGROUND**

**I. Facts**[3]

On July 10, 2004, Amtrak had three construction projects in progress along the Number 1 Line of the East River Tunnel.  From east to west, the projects were: (1) the removal and installation of a breaker (the "Breaker Project"), (2) the installation of a fire standpipe system (the "Standpipe Project"), and (3) the removal and replacement of track ties.  Amtrak contracted with STV/HMM to provide construction management services for the Standpipe Project.  Crescent was the general contractor hired to install the standpipe system.  The Breaker Project, which utilized a crane owned and operated by Amtrak, was located approximately three-quarters of a mile to the east of the Standpipe Project.  The Breaker Project did not, however, involve STV/HMM or its personnel.  The issue is whether STV/HMM can be held responsible for injuries at the Standpipe Project caused by the crane from the Breaker Project.

The "Services Contract" (the "Contract") between Amtrak and STV/HMM includes a "statement of work" and "general provisions" for construction management services.  (Services Contract inclusive of Statement of Work and General Provisions, Declaration of Ronald E. Joseph, Ex. C.)[4]  The Contract provides a list of objectives for STV/HMM, including: overseeing the general contractor and other contractors; maintaining records of project activities; minimizing construction changes, claims and budget increases; ensuring compliance with contract terms by contractors; and coordinating track outages for contractors.  (Statement of Work ¶ 1.2.)  Under the Contract, STV/HMM is also required to "[r]eview and comment on GC [General

---

[3] The facts are generally taken from the R&R.  Since the motions in the three cases are substantively identical, Judge Gorenstein referred exclusively to the filings in the Gayle Action in the R&R.

[4] The Contract provides that it is governed by District of Columbia law.  (General Provisions ¶ 23.)

3

Construction Contractor] Safety Plan and monitor GC Safety Plan during construction."

(Id. ¶ 1.2(G).)

STV/HMM agreed to employ a "safety engineer" with "a minimum of seven (7) years experience in safety aspects of heavy construction on projects of similar complexity and magnitude."  (Id. ¶ 2.6.2(E).)  The safety engineer was required to "be familiar with all required Amtrak, LIRR, OSHA safety regulations . . . [and to have] [s]ucessfully completed the 30-hour OSHA course on Construction Safety and Health (29CFR10126)." (Id.)  Under the heading "Project Safety," the Contract provides:

> The CM [STV/HMM] shall designate a Safety Officer who shall have full authority to act in behalf of the CM at all times to ensure that all construction work is being performed in accordance with standard industry practices and with state and federal laws regulating job site safety.  This position shall review and recommend approval of all GC work plans with regard to safety related issues.  Questionable work practices planned to be used by the GC and his sub-contractor(s) shall be noted by the CM and promptly brought to the attention of the GC and the Amtrak Project Manager both verbally and in writing prior to the commencement of such work in the field.  All CM personnel who enter into any track area of Amtrak/LIRR shall be required to attend the Amtrak RWP training prior to entering the area.

(Id. ¶ 3.2.11.)

Amtrak employees, including "force account personnel," were to work at the Standpipe Project. (R&R at 9.)  It is undisputed that Amtrak pilots (rail truck operators) were among the "force account personnel" assigned to the Standpipe Project.  (Id.) Paragraph 1.3.1 of the Contract, "Force Account Work," states:

> Amtrak force account personnel will provide protection as well as perform a portion of the work required.  The CM, with periodic assistance from the Amtrak Project Manager will ensure that necessary Amtrak forces are mobilized to support their share of the construction effort.  The CM will: (i) monitor the work of Amtrak's force account; (ii) provide assistance in planning, budget analysis and job control; (iii) provide technical assistance if required; and (iv) coordinate force account work with work to be

4

>scheduled or having been performed by others, and integrate all
>construction operations into a Master Construction Schedule.

(Statement of Work ¶ 1.3.1.)  STV/HMM was responsible for providing various "field support personnel, including project managers, schedulers, resident engineers, field inspectors and safety engineer, for the purpose of managing, monitoring, and inspecting the work of the GC and all subcontractors, Amtrak force account personnel and utility companies."  (Id. ¶ 2.5.1.)  The section of the Contract dealing with the "Construction Phase/Force Account Interface," states that STV/HMM "shall monitor force account (FA) work and verify FA invoices though field checks and the review of FA production reports."  (Id. ¶ 3.2.1(D).)

The Standpipe Project's workers consisted of STV/HMM staff, including a safety engineer; construction workers employed by Crescent; and Amtrak employees, including "pilots," who piloted rail trucks to and from the worksite.  In July, 2004, Gayle was an Amtrak pilot assigned to the Standpipe Project.[5]  Amtrak pilots Derek Ezekiel ("Ezekiel") and Sam Nesmith ("Nesmith") were also assigned to the Standpipe Project.  (Declaration of Howard Carter ¶ 4, Joseph Decl., Ex. B.)  All three were "force account employees" under the Contract.  (Id.; Statement of Work ¶ 1.3.1.)

Amtrak monitored movement along the railroad line and briefed Amtrak foremen assigned to the three project sites regarding construction.  Amtrak foreman David Zolinski ("Zolinski") oversaw track protection along the full line and monitored track movement.  As required by the rules promulgated by the Northeast Operating Rules Advisory Committee ("NORAC Rules"), Zwolinski had taken the track (the Number 1

---

[5] The plaintiffs in the Adornetti and Vitale Actions were both truck drivers employed by Crescent. (Deposition of Joseph Adornetti at 57:07-17, Joseph Decl., Ex. E; Deposition of Girolamo Vitale at 37:02-38:16, Joseph Decl., Ex. F.)

Line of the East River Tunnel) at the Standpipe Project out of service. Bobby Avent ("Avent"), another Amtrak foreman, was responsible for track protection at the Breaker Project, which as noted, was less than a mile to the east of the Standpipe Project. As explained by Magistrate Judge Gorenstein, it is unclear whether Ezekiel or Gayle, both of whom were Amtrak foremen, was the head protection officer responsible for the Standpipe Project. Ezekiel and Gayle were both, however, aware of the Breaker Project and that the work crew's equipment involved a crane.

Louis Cevasco ("Cevasco"), STV/HMM's safety engineer assigned to the Standpipe Project, was present at the work site on July 10, 2004. Gayle was in one of Crescent's rail trucks and Ezekiel was stationed above the East River Tunnel. Ezekiel, however, abandoned his post with Nesmith (who was also an Amtrak foreman) and was not at the Standpipe Project site at the time of the accident.

Things went wrong at the Breaker Project at around 3:40 a.m. on July 10, 2004. Amtrak employee David Collins ("Collins") lost control of the crane he was operating and the crane began rolling west towards the Standpipe Project. It took the crane at least four or five minutes to travel the approximately 4,062 feet to the Standpipe Project, where it collided with three Crescent rail trucks. Several people were injured, including Gayle, who was the only Amtrak pilot at the Standpipe Project at the time of the accident.

As the crane was rolling from the Breaker Project towards the Standpipe Project, HMM construction supervisor Glenn Pedersen ("Pedersen") was sitting with Cevasco in one of the three Crescent rail trucks. Pedersen testified that between one and three minutes before the collision, he heard a beeping sound that indicated movement along the rail line. Pedersen explained, however, that the beeping sound he heard was common to

6

the Standpipe Project site because it was the same sound made by trucks.  According to Pedersen, after he and Cevasco heard the beeping, "we were wondering who it was coming towards us.  Kept working and got curious because it just kept coming.  And I turned around and I looked and I saw the crane, jumped from the truck myself, and basically that was it."  (Deposition of Glenn Pedersen at 8:22-9:5, Joseph Decl., Ex. H.)

Amtrak's investigation into the accident showed that after Collins lost control of the crane, Avent (the Breaker Project foreman) made a distress call on a general radio channel stating "[e]mergency, emergency, emergency.  The crane is rolling away."  (R&R at 6.)  Gayle testified that he did not hear an emergency message.  An Amtrak employee who reviewed the tapes of the radio transmissions testified that Avant's distress call was very faint.  At 3:43 a.m., Avant called Pennsylvania Station Command Control ("PSCC") by telephone and reported that the crane was rolling towards the Standpipe Project.  He concluded the call by stating "[l]et me try to get a hold of Gayle or one of those guys."  (Id.)   Ezekiel, who was driving to the Standpipe Project site at the time of the accident, received a phone call about the out-of-control crane.  He called Gayle to warn him, but could not get through.

Under the Contract, STV/HMM was required to "equip all field personnel with radio and/or other communications (walkie-talkie, cell phones, pagers, etc.) using a frequency that would be available to selected Project personnel as shown in the Other Direct Costs."  (Statement of Work ¶ 3.1.6(D).)  While the Standpipe Project work crew carried cell phones and radios, the STV/HMM Assistant Project Manager testified that he was aware of communication "dead zones" in the tunnel prior to the accident.  The Assistant Project Manager did not, however, take any remedial measures.  (R&R at 7.)

Cevasco testified that prior to the accident cell phones and radios would fail at certain point in the tunnel. (Id.) Cevasco spoke informally with Amtrak about the problem, but never took any formal remedial measures. Gayle, who contacted the PSCC immediately after the accident, testified that his cell phone and radio were both working on the night of the accident.

**II. Governing Law and Magistrate Judge Gorenstein's R&R**

Under New York law, the elements of negligence "are (1) a duty owed by the defendant to the plaintiff, (2) a breach of that duty, and (3) a showing that the breach of that duty constituted a proximate cause of the injury." Ingrassia v. Lividikos, 54 A.D.3d 721, 724 (App. Div. 2d Dep't 2008). "Without a duty running directly to the injured person there can be no liability in damages, however careless the conduct or foreseeable the harm." Lauer v. City of New York, 733 N.E.2d 184, 187 (N.Y. 2000).

A "construction manager will not be held liable . . . for negligence in the absence of evidence that it controlled or supervised the work or manner of work from which the injuries arose." Moore v. New York City Econ. Dev. Corp., No. 133658/04, 26 Misc. 3d 1211(A), 2010 WL 157556, at *3 (Richmond County Sup. Ct. Jan. 7, 2010); see Domino Prof'l Consulting, Inc., 57 A.D.3d 713, 715 (App. Div. 2d Dep't 2008); Weitz v. Anzek Constr. Corp., 65 A.D.3d 678, 681 (App. Div. 2d Dep't 2009). "A breach of a contractual obligation will give rise to tort liability vis-à-vis injured third parties only in limited circumstances." Cresvale Int'l Inc. v. Reuters Am., Inc., 257 A.D.2d 502 (App. Div. 1st Dep't 1999). The New York Court of Appeals has identified,

> three situations in which a party who enters into a contract to render services may be said to have assumed a duty of care – and thus be potentially liable to third persons: (1) where the contracting party, in failing to exercise reasonable care in performance of his duties,

8

> "[l]aunches a force or instrument of harm"; (2)where the plaintiff detrimentally relied on continued performance of the contracting party's duties and (3) where the contracting party has entirely displaced the other party's duty to maintain the premises safely.

Espinal v. Melville Snow Contractors, Inc., 773 N.E.2d 485, 488 (N.Y. 2002) (internal citations omitted).[6]

A breach of duty is a proximate cause of an injury if "the breach was a substantial factor in causing the injury." Sawyer v. Wright, 196 F. Supp. 2d 220, 227 (E.D.N.Y. 2002). There can be more than one proximate cause of an injury. See Alexander v. City of New York, 21 A.D.3d 389, 390 (App. Div. 2d Dep't 2005).

Since STV/HMM did not supervise or control work at the Breaker Project, Magistrate Judge Gorenstein framed the question as whether STV/HMM breached a duty of care to provide a safe working environment for the workers at the Standpipe Project. (R&R at 16.) Magistrate Judge Gorenstein noted that under the Contract, STV/HMM was clearly responsible for certain elements of worker safety at the Standpipe Project. He held, however, that based on the uncontradicted evidence, Amtrak had exclusive control over track safety. (Id. at 17, 20.) Given Amtrak's control over track safety, Magistrate Judge Gorenstein concluded that STV/HMM cannot be held liable for negligence in connection with crane accident. (Id. at 20.)

In support of his conclusion, Magistrate Judge Gorenstein described the elaborate procedures Amtrak instituted to ensure track safety. It is undisputed that Amtrak was governed by the NORAC Rules, (R&R at 17; Amtrak Objections at 5; Gayle Objections at 12-13), which are a set of rules governing the railroad operations of Amtrak and other

---

[6] As noted by Magistrate Judge Gorenstein, STV/HMM does not contest the proposition that it can be held liable for violating safety obligations in the Contract to a "known and identifiable group." Palka v. Service Master Mgmt. Corp., 634 N.E.2d 189, 195 (N.Y. 1994); (R&R at 16.)

9

railroads.  (NORAC Rules Introduction, Declaration of Robert Ely, Ex. E.)  The NORAC rules apply "to all railroad employees when they are working on a NORAC member railroad's property."  (Id.)

NORAC Rule 131, "Protecting Work Locations: Qualified Employee's Duties," requires, "[q]ualified employees assigned to protect work locations of railroad construction or private contractors whose operations may affect the safe movement of trains," to take certain steps to ensure track safety.  (NORAC Rule 131.)  Subsections (2) and (3) of NORAC Rule 131 require railroad employees to "ensure that tracks are not fouled without permission" and to "get permission to foul track."  (NORAC Rule 131(2), (3).)  As defined by federal regulation, "[f]ouling a track means the placement of an individual or an item of equipment in such proximity to a track that the individual or equipment could be struck by a moving train or on-track equipment, or in any case is within four feet of the field side of the near running rail."  49 C.F.R. § 214.7.  Magistrate Judge Gorenstein explained that under NORAC Rule 131(2), STV/HMM needed Amtrak's permission to place workers or equipment on or near the track at the Standpipe Project.  (R&R at 18.)  And when a contractor needed to work on the track, the Amtrak employee "assigned to protect the work location . . . [was required to] communicate with the [Amtrak] employee in charge of the track to secure necessary permission."  (NORAC Rule 131(3); see R&R at 18.)

NORAC Rule 133 sets forth the procedure for taking track out of service.  (NORAC Rule 133.)  Among other things, the dispatcher must issue a "Form D" to the railroad employee requesting that track be taken out of service. (Id.)  Amtrak employees complied with NORAC Rule 133 with respect to the Standpipe Project.  (R&R at 18.)

Magistrate Judge Gorenstein described how Amtrak's obligations under the NORAC Rules dovetailed with its contractual obligations to STV/HMM. Under the Contract, Amtrak was obliged to assign "force account personnel" to the Standpipe Project. (Statement of Work ¶ 1.3.1.) Force account personnel were responsible for "protection," which the parties acknowledge means track protection. (Id.; R&R at 19.) The Amtrak "foremen" or "pilots" (Gayle, Ezekiel and Nesmith) at the Standpipe Project were force account personnel who arranged for STV/HMM to access the track and controlled movement on the track. (R&R at 19.)

Magistrate Judge Gorenstien also described how Amtrak's compliance with the NORAC Rules at the Standpipe Project worked in practice. If a worker dropped a tool on the track, he or she needed permission from Amtrak personnel to retrieve it. Amtrak would brief its foremen at the start of each shift regarding activity along the track and Amtrak foremen were "in charge of . . . outside contractors." (R&R at 19.) Indeed, Gayle testified that he did not report to STV/HMM, but instead to an Amtrak supervisor.

Magistrate Judge Gorenstein reasoned that the broadly phrased provisions in the Contract requiring STV/HMM to "monitor" Amtrak's force account personnel do not "trump the more specific requirements of the NORAC rules, the other terms of the contract, and the actual actions of the participants – all of which reflected that STV/HMM did not and could not supervise and control the work of any force account personnel with respect to track safety or protection." (R&R at 20.) Magistrate Judge Gorenstein held that based on the uncontroverted evidence, STV/HMM lacked the authority to supervise and control Amtrak force account personnel in discharging their duties to ensure track safety. Magistrate Judge Gorenstein accordingly rejected the

11

nonmovants' contention that STV/HMM was obliged under the Contract to provide track safety at the Standpipe Project site and that STV/HMM supervised and controlled track safety at the site. (R&R at 20.)

Magistrate Judge Gorenstein turned next to specific acts of STV/HMM which the nonmovants argued give rise to actionable negligence. According to the nonmovants, STV/HMM was negligent because it failed to ensure that Ezekiel remain at his post above the East River Tunnel. Magistrate Judge Gorenstein explained, however, that as a member of Amtrak's force account personnel, Ezekiel reported to Amtrak, not STV/HMM. Further, there is no evidence that STV/HMM was aware of the particular locations of Amtrak force account personnel and whether it was necessary for such personnel to be present at the Standpipe Project at all times. (R&R at 22.) Magistrate Judge Gorenstein concluded that STV/HMM was not responsible for ensuring that Ezekiel remained at his post. Magistrate Judge Gorenstein also noted that there is no evidence that Ezekiel's departure from his post was a proximate cause of the workers' injuries.

The nonmovants argued that STV/HMM was negligent because it failed to provide workers at the Standpipe Project with adequate communication devices. Magistrate Judge Gorenstein rejected this proffered basis for liability on grounds that Amtrak never directed STV/HMM to ensure specific communication capabilities between Amtrak personnel responsible for track safety. Instead, Amtrak reserved all track safety functions to itself.

Finally, Amtrak asserted that STV/HMM could be held liable because after hearing the "beeping sound," Pedersen failed to take any steps to alert the Standpipe

12

Project workers of the oncoming crane.  Magistrate Judge Gorenstein held that since the beeping sound was common to the work site, and Pedersen only observed the crane a "half second" before the collision, he could not be charged with a duty to identify the sound as a sign of danger and warn the other workers.

Since STV/HMM did not owe a duty of care with respect to track safety, and the nonmovants failed to adduce evidence that it otherwise breached its duty of care, Magistrate Judge Gorenstein recommended granting STV, HMM and STV/HMM's motions for summary judgment.

## DISCUSSION

### III. Standard of Review

A district court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1).  When a timely objection has been made to the recommendations of the magistrate judge, the Court is obligated to review the contested issues de novo.  See Hynes v. Squillace, 143 F.3d 653, 656 (2d Cir. 1998).  The Court, however, "may adopt those portions of the Report [and Recommendation] to which no objections have been made and which are not facially erroneous." La Torres v. Walker, 216 F. Supp. 2d 157, 159 (S.D.N.Y. 2000).

### III. Objection

#### A. Track Safety and STV/HMM's Duty of Care

Amtrak and Gayle both object to Magistrate Judge Gorenstein's conclusion that STV/HMM was not responsible for track safety.  (Amtrak Objections at 3-5; Gayle Objections at 8-9.)  The gist of their argument is that Magistrate Judge Gorenstein

13

misinterpreted the Contract, which they assert clearly makes STV/HMM responsible for safety at the Standpipe Project.

Amtrak provides a lengthy discussion of District of Columbia contract law and concludes that Magistrate Judge Gorenstein's interpretation of the Contract renders "key portions . . . illusory or meaningless." (Amtrak Objections at 4.) One principle of contract of interpretation is, however, particularly relevant here. In interpreting a contract, "the more specific contract term qualifies the general such that both may be given effect." Howard Univ. v. Best, 484 A.2d 958, 969 (D.C. 1984); see Washington Auto. Co. v. 1828 L St. Assocs., 906 A.2d 869, 880 (D.C. 2006) ("specific terms and exact terms are given greater weight than general terms.").

It is undisputed that STV/HMM had certain safety obligations under the Contract. (Statement of Work ¶¶ 1.2(G), 2.6.2(E), 3.2.2(F), 3.2.11.) But, STV/HMM's duty to provide workers with a safe work environment was not without limits. Paragraph 1.3.1 of the Contract states "Amtrak force account personnel will provide protection as well as perform a portion of the work required." (Statement of Work ¶ 1.3.1.) Paragraph 1.3.1 further provides that STV/HMM will "monitor the work of Amtrak's force account." (Id.) The portion of the Contract dealing with the interaction between STV/HMM and Amtrak's force account personnel states that STV/HMM "shall monitor force account (FA) work and verify FA invoices though field checks and the review of FA production reports." (Id. ¶ 3.2.1(D).) Paragraph 2.5.1 requires STV/HMM to provide various "field support personnel, including . . . [a] safety engineer, for the purpose of managing, monitoring, and inspecting the work of the GC and all subcontractors, Amtrak force account and utility companies." (Id. ¶ 2.5.1.) Thus, under the Contract a clear distinction

14

is made between force account "work" and "protection" responsibilities; STV/HMM was obligated to "monitor" force account employees with respect to their "work," as distinguished from their "protection" – i.e., track safety – responsibilities. To avoid rendering the specific provisions of the Contract distinguishing between force account personnel "work" and "protection" activities surplusage, the provisions must be read to qualify the more general contract provisions regarding STV/HMM's safety obligations. See Best, 484 A.2d at 969.

This interpretation of the Contract is consistent with Amtrak's responsibilities under NORAC Rule 131, which requires Amtrak employees (under the Contract, "force account personnel") to take certain actions "to protect work locations of railroad construction or private contractors whose operations may affect the safe movement of trains." (NORAC Rule 131.) It is also consistent with how track safety was in fact handled at the Standpipe Project worksite. Amtrak, not STV/HMM, controlled access to the track. (R&R at 19.) Amtrak foremen were briefed by, and reported to, Amtrak supervisors – not to STV/HMM. The totality of the evidence – the Contract, the NORAC Rules and the reality of track protection at the Standpipe Project – lead to the conclusion that Amtrak, not STV/HMM, was responsible for track safety. Since STV/HMM was not responsible for track safety, and did not "supervise or control" the Amtrak employees who were responsible for track safety, STV/HMM did not owe a duty of care with regard to track safety.

Gayle contends that nothing under the NORAC Rules precludes both Amtrak and STV/HMM from being responsible for track safety. (Gayle Objections at 12-13.) This may or may not be true; but what matters is that under the Contract, and in practice,

15

STV/HMM was not responsible for track safety. Whether STV/HMM could hypothetically take on responsibility for track safety under the NORAC Rules is of no moment.

**B. Amtrak Force Account Personnel**

Amtrak argues that STV/HMM can be held liable because it should have shut down the Standpipe Project, or at least notified Amtrak, once Ezekiel and Nesmith left their posts. It is not clear that STV/HMM had the authority to "shut down" the Standpipe Project.[7] And Amtrak does not point to any evidence that STV/HMM was aware the Ezekiel and Nesmith had left the worksite. But even if STV/HMM knew that the two Amtrak employees had left the work site, it was not STV/HMM's responsibility to "monitor" Ezekiel's and Nesmith's movements in connection with their "protection" activities. As noted, Amtrak was the sole entity responsible for track safety and so it was incumbent upon Amtrak to ensure its "force account personnel" properly discharged their duties to provide track safety. Ensuring that Ezekiel and Nesmith remained at their posts was not STV/HMM's responsibility.

**C. Communications at the Standpipe Project**

Gayle argues that the STV/HMM was negligent because it failed to provide functioning communications devices. (Gayle Objections at 13-14.) He objects to Magistrate Judge Gorenstein's conclusion that STV/HMM cannot be held liable based on its failure to provide adequate communication devices because Amtrak did not provide STV/HMM with "specific directions about the monitoring of its track safety workers – let alone direction regarding what STV/HMM should do to ensure specific communication

---

[7] In New York, "[t]he construction manager's authority to stop the contractor's work, if the manager notices a safety violation, does not give the manager a duty to protect the contractor's employees." Peay v. New York City School Constr. Auth., 35 A.D.3d 566, 567 (App. Div. 2d Dep't 2006).

16

capabilities among Amtrak personnel responsible for track safety." (R&R at 23.)

Gayle contends that whether Amtrak gave STV/HMM specific instructions is irrelevant. (Gayle Objections at 14.) According to Gayle, because STV/HMM was responsible for safety at the Standpipe Project, its safety officials' failure to "ensur[e] that proper communications were maintained with Amtrak or the LIRR regarding track conditions or oncoming train traffic, or ensur[e] that the crew working on the Standpipe Project was outfitted with functional communications equipments that would allow sufficient warning in advance of a rolling crane heading down tracks towards the tunnel housing the Standpipe Project," gives rise to actionable negligence. (Gayle Objections at 11.)

Under the Contract, STV/HMM was required to "equip all field personnel with radio and/or other communications (walkie-talkie, cell phones, pagers, etc.) using a frequency that would be available to selected Project personnel as shown in the Order Direct Costs." (Statement of Work ¶ 3.1.6(D).) But simply because STV/HMM was contractually required to provide communications devices, does not mean that a communications problem necessarily gives rise to tort liability. See Rosenbaum v. Branster Realty Corp., 276 A.D. 167, 168 (App. Div. 1st Dep't 1949) ("The failure to perform a contract obligation is never a tort unless it is also a violation of a legal duty. It is the breach of the duty imposed by law and not of the contract obligation which constitutes the tort."). As explained, STV/HMM's duty of care as a matter of tort law did not extend to track safety. Assuming STV/HMM breached its contractual obligation to "equip all field personnel with radio and/or other communications," such a breach does

not alter the scope of STV/HMM's duty of care and cannot, without more, support a finding of negligence.

**D. The "Beeping Sound"**

Finally, Amtrak objects to Magistrate Judge Gorenstein's conclusion that STV/HMM cannot be held liable for Pedersen's failure to identify the "beeping sound" as an indication of danger and warn the workers at the Standpipe Project site. (Amtrak Objections at 8.) Immediately before the accident, Pedersen was positioned on two connected rail trucks. According to Amtrak, if the beeping came was due to movement of the trucks, Pedersen "presumably would have felt it." (Amtrak Objections at 8.) Based on this surmise, Amtrak argues that Pedersen was negligent in failing to recognize that the beeping was a sign of danger and thereafter failing to warn the other workers.

Pedersen testified that he often heard the beeping sound at the project site and that the beeping aroused his curiosity only because it continued. Pedersen did not, however, observe the crane until a half second before the accident. As Amtrak would have it, Pederson was negligent because he failed to notice what no one else at the Standpipe Project site noticed in enough time to warn other workers. In the dead of night, he should have seen the crane which no one else saw. The Court rejects Amtrak's argument. It was neither Pedersen's nor STV/HMM's responsibility to identify dangers on the track; that was Amtrak's responsibility. In light of this, Pedersen (and hence STV/HMM) was not negligent in failing to identify the source of the "beeping sound" in enough time to warn other workers.

## CONCLUSION

For the foregoing reasons, the Court accepts and adopts the Report and Recommendation as its opinion. STV, HMM and STV/HMM's motions for summary judgment are GRANTED. The Clerk is directed to close the motions at docket numbers 120, 125 and 209 in 06 Civ. 6956; docket numbers 135, 141 and 181 in 06 Civ. 6195; and docket numbers138, 143 and 184 in 06 Civ. 6196.

Dated: New York, New York
March 29, 2010

SO ORDERED

PAUL A. CROTTY
United States District Judge